UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

PATRICK BOISMENU,

                            Plaintiff,

         -against-

IRONWORKS BVI, LTD. a/k/a IRONWORKS
TRADING, LTD. d/b/a FERRUM NETWORK

                           Defendants.

-----------------------------------------------------------x

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff Patrick Boismenu ("Boismenu" or "Plaintiff"), by his attorneys, Romano Law PLLC, hereby files his complaint against Defendant Ironworks BVI Ltd. a/k/a Ironworks Trading, Ltd. d/b/a Ferrum Network ("Ferrum Network" or "Defendant").  Boismenu alleges as follows on personal knowledge as to matters relating to himself and on information and belief as to all other matters:

## NATURE OF THE ACTION

     1.     Plaintiff Patrick Boismenu brings this action for damages arising from Ferrum Network's breach of contract, breach of covenant of good faith and fair dealing, conversion, unjust enrichment, negligent misrepresentation, and fraud.

     2.     Boismenu is an expert in cryptography and crypto currencies with decades of experience in these fields.

     3.     Ferrum Network was an early-stage startup that recruited Boismenu to provide critical services as it grew into a successful company, on promises that Boismenu would handsomely compensated.

1

4.      In particular, Boismenu created virtual currency token metrics that modeled the lifecycle and economy of new currencies for Defendant's Ferrum Advisory Services ("FAS") clients (the "FAS Clients").

5.      Ferrum Network co-founder Ian Friend was heavily involved in recruiting Boismenu to Ferrum Network.

6.      On or about January 21, 2021 Friend sent a text message to Boismenu stating: "hey so in terms of the contract.  I was thinking 15% of funds we raise and 15% of the tokens we get. With this structure youll [sic] probably be able to quit your job after the next launch lol"

7.      Boismenu responded "Ill [sic] go with what you propose Ian. :) I trust you because I know your personality and I am happy you got me on board . . . ."

8.      Ferrum Network ultimately drafted a Senior Advisor Agreement with Boismenu dated January 25, 2021 (the "Advisor Agreement"), offering Boismenu fifteen percent of fees generated from FAS Clients, as originally proposed by Friend.

9.      Boismenu accepted and signed the Advisor Agreement and the fifteen percent terms that Ferrum Network proposed.  A true and accurate copy of the fully executed Advisor Agreement is annexed hereto as **Exhibit A**.

10.     At that time, Boismenu was essentially running the FAS program along with Friend.

11.     Largely due to Boismenu's efforts, the FAS program became very profitable for Ferrum Network.

12.     As Ferrum Network grew, however, it began to callously fire experts like Boismenu who built the company, replacing them with cheaper, less knowledgeable workers.

13.     Around March of 2022, Ferrum Network held meetings with Boismenu via Zoom (and recorded by Ferrum Network) where Friend claimed Boismenu had become too expensive.

14.     Ferrum Network tried to buy Boismenu off with a $5k pittance even though Ferrum Network's own early estimate indicated it owed Boismenu tokens worth nearly four hundred thousand dollars at that time.

15.     Then, without warning, on May 27, 2022 Ferrum Network's legal consultant sent Boismenu a contractually *invalid* termination notice (the "Termination Letter"), claiming Boismenu's Advisor Agreement had been terminated nearly two months ago, as of April 8, 2022. A true and accurate copy of this Termination Letter is annexed hereto as **Exhibit B**.

16.     The Advisor Agreement required any such termination to be sent in writing *seven days in advance*, not almost two months after fact, as Defendant purported to do.

17.     Defendant's material delay was not only a contractual breach but was also intentionally engineered to cheat Boismenu out of the value of owed tokens.

18.     As of April 8, 2022, Ferrum Network owed Boismenu virtual currency payments worth at least $1,059,959.44.

19.     The Termination Letter offered Boismenu less than two percent of this amount.

20.     In fact, Ferrum Network had engineered payment delays before April 8, 2022, attempting to take advantage of a drop in token prices and to cheat Boismenu to the tune of millions.

21.     Ferrum Network then strategically hid its intention to terminate during a time when virtual currencies owed to Boismenu continued losing value, attempting to further cheat Boismenu by hiding its purported backdated termination of his contract.

22.     Ferrum Network compounded these actions by inventing fictitious post-hoc reasons for denying Boismenu payment based on made-up alleged failures by Boismenu to provide services not required under the Advisor Agreement and not previously requested by Ferrum Network.

23.     Ferrum Network now insists, contrary to its written, executed contract, and contrary to its representations to Boismenu, that it would be unreasonable to pay Boismenu contractually owed payments.

24.     Instead, Ferrum insists on buying off Boismenu for a pittance of less than two percent of contractually earned compensation.

25.     Despite legal demand and notice, Ferrum Network continues to refuse its payment obligations, though it admits these are required by the Advisor Agreement.

26.     Separately from these contractual breaches and schemes, Defendant's co-founders and officers Friend and Naiem Yeganeh ("Yeganeh") also fraudulently induced Boismenu's personal investments into Ferrum Network projects.

27.     For example, Friend persuaded Boismenu to invest Boismenu's personal funds into Ferrum projects by promising Boismenu significant returns on these investments and other "over the counter" purchases.

28.     Yeganeh personally encouraged Boismenu's investments in Ferrum Network, promising a significant return on Boismenu's investment.

29.     Yeganeh also took Boismenu's funds for the over the counter investments.

30.     On April 14, 2021 Boismenu contacted Yeganeh directly regarding a purchase of 150,000 Ferrum Network tokens, noting that Friend had instructed him to contact Yeganeh directly.

31.     Yeganeh facilitated Boismenu's purchase using a method that Boismenu indicated he had "never done before."

32.     Boismenu invested $114,000 to purchase the 150,000 Ferrum Network tokens.

33.     Yeganeh received these funds, and also facilitated other over the counter virtual currency transactions with Boismenu.

34.     Accordingly, Boismenu brings this action for breach of contract, breach of covenant of good faith and fair dealing, conversion, unjust enrichment, negligent misrepresentation, and fraud.

## PARTIES, JURISDICTION, AND VENUE

35.     Boismenu is a natural person and a citizen of Canada.  He currently resides in Cairo, Egypt.

36.     Upon information and belief, Ferrum Network is a British Virgin Islands corporation.

37.     The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000).

38.     Therefore, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.

39.     Moreover, this Court has personal jurisdiction over Defendant pursuant to New York CPLR § 302.

40.     Upon information and belief, Defendant has a remote work force whose founding members and key team members work from New York City in this district.

41.      Upon information and belief, Defendant continues to maintain an office in this district.

42. Ferrum Network regularly transacts business in New York and committed tortious acts within New York.

43. More specific to this matter, upon information and belief Ferrum Network co-founder Ian Friend drafted and negotiated the Advisor Agreement in New York.

44. Moreover, Ferrum Network's internal legal consultant Michael Nacmias (whom Defendant identifies as a Ferrum "Team Member") maintains an office in Brooklyn, NY.

45. Mr. Nacmias sent the backdated Termination Letter on letterhead with this Brooklyn, New York address.

46. Boismenu's claims, alleged below, arise from Defendants' activities in New York.

47. Boismenu's contractual claims arise from the Advisor Agreement Ferrum drafted, governed by New York law.

48. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because upon information and belief, the events or omissions giving rise to the claims occurred in the Eastern District of New York.

## FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF

### A. Boismenu's Contract with Ferrum Network

49. Ferrum Network advertises itself as a leader in blockchain interoperability using an "Infinity Layer Mainnet" and "Quantum Portal" to facilitate deployment of smart contracts across networks.

50. Ferrum Network also offers a decentralized finance ("DeFi") product named "Crucible," advertising a fifty percent (50%) annual percentage yield to consumers who buy and stake Ferrum Network tokens (FRM).

51. Yeganeh founded Ferrum Network in 2018, hiring Friend as a cofounder.

52.     Ferrum Network grew and, in the beginning of 2021, hired Boismenu as a "Senior Advisor" pursuant to the Advisor Agreement.

53.     The Advisor Agreement states that Boismenu is an independent contractor to Ferrum Network.

54.     The Advisor Agreement does not have a non-compete provision or require Boismenu to work exclusively for Ferrum Network.

55.     Rather, the Advisor Agreement simply requires Boismenu to provide advisory services for compensation.

56.     In fact, the Advisor Agreement specifically contemplates that Boismenu will provide services for other entities, and defendants were at all times aware that Boismenu was providing such services.

57.     Boismenu's services to Ferrum are generally described as "to act as an advisor to the Company and provide advice and assistance to the Company as mutually agreed to by the parties (the "Services")."

58.     They are specified to include "assistance with all Ferrum Advisory Services clients, forming token economics, providing advisory [services] to clients in terms of the raise and marketing strategies, and other similar services the parties agree are necessary to further Company's business and marketing goals."

59.     Notably, the Advisor Agreement did not specify Boismenu's attendance at weekly meetings or specific performance metrics.

60.     Rather, the Advisor Agreement incentivized Boismenu's advisory services by awarding him fifteen percent (15%) of the finders' fees and tokens earned from Ferrum Advisory Services clients (FAS Clients).

61.     These compensation terms aligned Boismenu's economic interests with the success of the Ferrum Advisory Services program.

62.     As to tokens, the Advisor Agreement states Boismenu "shall" receive "15% of the tokens earned by the Company from its FAS business services."

63.     It also specifies the timing of this receipt shall be "in accordance with the vesting schedules as agreed upon with the particular FAS clients."

64.     These compensation provisions are clear and unambiguous.

65.     As to the finders' fee, the Advisor Agreement states Boismenu "shall receive" payment in "USDT" of "15% of the finder's fees sourced by Company based on the fees it generates from raising funds for FAS clients."

66.     USDT signifies "Tether," a "stablecoin" or virtual currency with stable valuation.

67.     Tether is pegged to the United States Dollar (i.e., one Tether is always valued at $1.00 USD).

68.     The Advisor Agreement further provides that these USDT funds "shall be transferred" "no more than three (3) days following the Company's receipt of such funds by the FAS client(s)."

69.     These compensation provisions are clear and unambiguous.

70.     Finally, the Advisor Agreement provided for termination "by either party for any reason upon seven (7) days prior written notice" subject to Ferrum Network's obligation to pay "compensation earned" by Boismenu through such date of termination.

71.     This termination provision is also clear and unambiguous.

72.     The Advisor Agreement has an integration clause and is governed by New York law.

73. Boismenu executed this Advisor Agreement for himself, and Defendant Ian Friend executed for Ferrum Network.

**B. Boismenu's Performance and Ferrum Network's Breach**

74. Boismenu began providing advisory services under the Advisor Agreement in January of 2021.

75. These advisory services included assisting Ferrum Advisory Services clients, and working on token metrics, economics and strategies for fund raising and marketing, as stated in the Advisor Agreement.

76. During this time Boismenu performed his work diligently, and Ferrum Network's advisory services generated millions of dollars to Ferrum Network.

77. At no point prior to his purported termination did any person at Ferrum Network express to Boismenu any dissatisfaction with the quality or amount of advisory services he provided.

78. Moreover, even though Ferrum Network could have terminated the Advisor Agreement at any time with seven days' written notice, it did not exercise any termination right for over a year.

79. Instead, on May 27, 2022, Ferrum Network's "Legal Consultant" Michael Nacmias sent Boismenu the Termination Letter, claiming that the Ferrum Network had already terminated Boismenu almost two months before, "effective April 8."

80. The Advisor Agreement requires notice of termination at least seven days *in advance* of termination.

81. Thus the supposed backdated termination was contractually invalid.

82.     Moreover, the purported Termination Letter offered Boismenu a severance worth approximately $17,000, even though the value of Boismenu's tokens earned as of April 8 exceeded one million dollars.

83.     In the Termination Letter, Nacmias claimed that "Ferrum cannot pay someone fifteen (15%)" and that this is "not fair or reasonable."

84.     Ferrum Network drafted and signed the Advisor Agreement, which unambiguously requires Defendant to pay Boismenu fifteen percent (15%) of finder's fees and tokens earned from its FAS Clients.

85.     Ferrum Network purportedly based its novel interpretation of the Advisor Agreement (as set forth in the Termination Letter) upon Boismenu's alleged failure to attend meetings that he was neither asked to attend, nor required to do so under the Advisor Agreement.

86.     In fact, Defendant Friend explicitly told Boismenu in writing that he was not required to attend these meetings, long before Ferrum Network concocted this fictitious basis for swindling Boismenu out of earned compensation.

87.     The Termination Letter also claimed that Boismenu was somehow required to attend weekly meetings for each FAS Client (noting this comes to 52 meetings per client a year, not including "spontaneous" meetings per client), assist in "client pitches," respond to "client/team messages," attend "launch meetings," respond to instant messages on Slack and Telegram, be "very active across all Ferrum activities," and meet "many more KPIs/deliverables that are expected of advisors."

88.     Notably, not one of these supposed requirements is stated in the Advisor Agreement and at no time prior to his receipt of the Termination Letter was Boismenu advised of these purported requirements.

89.     In fact, when Boismenu contacted Defendant Friend about the excessive meetings Ferrum Network was asking Boismenu to attend, Friend responded: "U don't need to attend those mtgs . . . Idk [I don't know] why ivan keeps inviting u . . . I don't even attend most of them lol." [sic].

90.     Defendant did not draft the Advisor Agreement to base compensation on internal meeting attendance, but rather on the performance of the FAS program.

91.     Therefore, Boismenu's compensation was entirely based on the program success.

92.     If, as Defendant now claims, Boismenu's attendance at meetings harmed the FAS program's growth, this would automatically reduce Boismenu's payments.

93.     Essentially, if Boismenu had somehow failed to provide adequate services, Ferrum's payment obligations would have reduced proportionately (because Boismenu's compensation was based on a percentage of finders' fees and tokens that Ferrum earned from its FAS Clients).

94.     Therefore, Defendant's purported reason for cutting Boismenu's payment, even if not contradicted by Defendant's written statements to Boismenu (as it is), would still not justify Defendant swindling Boismenu out of 98% of his contractually owed compensation.

95.     The Termination Letter also insinuated that Boismenu should not have undertaken other ventures, the implication being that he should have been exclusively working for Ferrum.

96.     Notably, the Advisor Agreement does not require Boismenu to work exclusively for Ferrum Networks.

97.     In fact, the Advisor Agreement specifies that Boismenu is an independent contractor.

98.     The Advisor Agreement also addresses potential conflict situations, and what steps should be taken should Boismenu become aware he is providing services to a competitor.

99.     Therefore, the Advisor Agreement explicitly contemplates that Boismenu can and will engage in professional activities outside of Ferrum Network, even potentially competitive services.

100.    Moreover, at no time before the May 27 Termination Letter did any person at Ferrum Network complain to Boismenu that he was not meeting any specific metrics or KPIs.

101.    At no point prior to Plaintiff's receipt of the Termination Letter did any person at Ferrum Network complain to Boismenu that he should not take on other projects.

102.    At no point before the May 27 Termination Letter did Ferrum Network attempt to exercise its right to terminate the Advisor Agreement with seven days advance notice due to any alleged non-performance or conflicts.

103.    Instead, Ferrum Network sent the Termination Letter nearly two months after the fact, in breach of the Advisor Agreement.

104.    The Termination Letter spun a web of post-hoc fictitious reasons why Ferrum Networks refused to pay over one million dollars owed to Boismenu, offering him less than two percent of contractually owed payments.

**C.  Boismenu's Damages**

105.    In reality, Ferrum Network was aware that the price of non-USDT tokens owed to Boismenu was falling and has been since around November of 2021.

106.    Ferrum Network deliberately delayed its Termination Letter to take advantage of these dropping prices, while backdating the termination date to prevent Boismenu from earning any of the 15% fees on advisory clients after this concocted April 8 termination date.

107.    To take as an example just one virtual currency out of thirty in which Ferrum Network owes Boismenu payment, the price of the Netvrk token on November 30, 2021 was approximately $8.46 per token.

108.    The 87,000 Netvrk tokens Ferrum Networks owes Boismenu had a value then of over $736,000.

109.    On April 8, 2022, the date Ferrum insists it terminated Boismenu's Advisor Agreement, these tokens had fallen in value to $1.64 per token, making Boismenu's tokens worth $142,680.

110.    By waiting even further to notify Boismenu of termination, Ferrum Network took advantage of a further price drop to about $0.40 per token, a nearly 75% further loss of value.

111.    On the other hand, by back dating Plaintiff's termination, Ferrum Network attempted to avoid paying Boismenu all tokens he earned from April 8 to May 27 at fifteen percent of FAS Client fees.

112.    Regardless, because Defendant served a contractually invalid Termination Letter, Defendant never properly terminated the Advisor Agreement.

113.    In fact, the Advisor Agreement required Ferrum Network to transfer Boismenu tokens "in accordance with the vesting schedules as agreed upon with the particular FAS clients."

114.    Boismenu trusted Ferrum Network and relied upon the company to disclose these schedules and dates so that he would know when he was owed tokens.

115.    Ferrum Network's payment delays were also wholly inconsistent with written representations Friend made to Boismenu when recruiting him, including: "usually the tokens are sent to us each month for twelve months . . . so if we do 3-4 of these, you'll be making a nice monthly salary."

116.    Upon information and belief, Ferrum Network, at the direction of defendants Friend and Yeganeh, withheld this information when token prices began to fall, to mislead Boismenu into accepting tokens at lower USD valuations.

117.    At a minimum, Ferrum Network engineered a two-month delay in noticing termination to cut off Boismenu's compensation and take advantage of loss of token value.

118.    The Advisor Agreement required advance notice of termination, which would have prevented this bad faith conduct.

119.    In addition to the amounts owed directly pursuant to the Advisor Agreement, the retroactive termination scheme has also devalued and deprived Boismenu of his personal investment in the "investor" tokens.

**D.    Boismenu's Attempt to Resolve This Issue**

120.    Starting around November, 2021, Boismenu began compiling records of the tokens owed to him by Ferrum.

121.    He notified Ferrum via Ferrum's Slack messaging account of the specific tokens Ferrum owed him, on a rolling basis, as of October 12, 2021 through March 22, 2022.

122.    Boismenu sent these Slack requests to Ferrum on December 26, 2021, January 23, 2022, March 3, 2022, March 23, 2022 and April 13, 2022.

123.    At no time did Boismenu receive any additional tokens pursuant to his requests.

124.    On April 13, 2022, Friend responded via Slack to Nichell Logue, Executive Vice President of Operations and Boismenu as follows: "Let's discuss more on the call. But regardless of the exact figures i think we can all agree that it's not fair for one team member to be paid so much more than anyone else."

125.    Friend thereby admitted that Ferrum had tricked Boismenu by promising him 15% terms without disclosing Ferrum Network's intention to breach those terms at any time if Ferrum Network decided "it's not fair."

126.    Moreover, Ferrum Network admittedly intentionally breached the Advisory Agreement and unambiguous compensation terms that Defendant drafted and Boismenu accepted.

### E.  Defendant's Continued Misrepresentations Made by its Legal Representative

127.    Between his receipt of the Termination Letter and his engagement of counsel, Boismenu further attempted, without success, to negotiate a fair resolution of his owed compensation.

128.    On June 20, 2022 Boismenu sent a legal notice and demand to Ferrum Network asking for a proper accounting and payment of his earned compensation under the Advisor Agreement.

129.    This June 2022 letter also included a calculation of tokens owed to Boismenu valued as of April 8, 2022 showing owed compensation of over one million dollars.

130.    This calculation is very conservative because in actuality tokens were likely owed earlier than April 8, 2022, at much higher valuations.

131.    Ferrum Network refused to respond.

132.    On July 6, 2022 Boismenu's counsel followed up with Ferrum Network's in house legal consultant Nacmias.

133.    Ferrum Network again refused to respond.

134.    On July 20, Boismenu's counsel again wrote to Ferrum Network's in house legal consultant, this time threatening litigation.

135.    On July 25, Ferrum Network requested a week to submit a revised compensation proposal.

136.    Boismenu's counsel agreed and asked for a response by August 5.

137.    Ferrum Network did not respond by August 5.

138.    It was only after Boismenu's counsel again threatened litigation that Ferrum Networks claimed it would respond the morning of August 8.

139.    Ferrum Networks did not respond on August 8.

140.    Only after Boismenu's counsel followed up with Ferrum Networks, *inter alia*, on August 12, September 7, September 15, and September 19, 2022 did Ferrum Networks finally provide a response on September 20, 2022.

141.    In its response, Ferrum Networks' internal legal officer deliberately misrepresented Ferrum's receipt of tokens, falsely claiming that Defendant had not received tokens on FAS Client projects.

142.    Because of Defendant's continued stonewalling, lies and brazen attempts to defraud Mr. Boismenu, and left with no other choice, Boismenu brings this legal action against Ferrum Network.

### FIRST CLAIM FOR RELIEF
**Breach of Contract**

143.    Boismenu incorporates by reference each and every allegation contained above as though fully set forth herein.

144.    Boismenu and Ferrum Network are both parties to the January 25, 2021 Advisor Agreement, which is a valid and enforceable contract under New York law.

145.    Boismenu performed the services required of him under the Advisor Agreement.

146.    The Advisor Agreement requires Ferrum Network to pay Boismenu fifteen percent (15%) of finder's fees and tokens earned from FAS Clients.

147.    The Advisor Agreement states that finder's fees in USDT shall be paid within three days of receipt and tokens shall be paid in accordance with the vesting schedules agreed to with FAS Clients.

148.    The Advisor Agreement states it shall not terminate unless notice is given seven days in advance.

149.    Ferrum Network sent a purported termination notice (i.e., the Termination Letter) on May 27, 2022, claiming to terminate the Advisor Agreement as of April 8, 2022.

150.    This termination notice was not sent at least seven days prior to termination as required by the Advisor Agreement.

151.    Therefore, it was ineffective under the Advisor Agreement.

152.    Accordingly, the Advisor Agreement remains in effect and Boismenu continues to earn USDT finders' fees and tokens until the Advisor Agreement is terminated.

153.    Moreover, these tokens are owed "in accordance" with FAS Client vesting schedules.

154.    Thus, Ferrum Network was required and is still required to transfer Boismenu's fifteen percent (15%) share of the tokens as of the dates they vested.

155.    Even if Ferrum Network's Termination Letter somehow constitutes a valid termination (it does not), the Advisor Agreement would require payment of any tokens earned prior to the purported April 8, 2022 termination.

156.    As of April 8, 2022, the value of Boismenu's owed tokens exceeded one million dollars.

157.     Upon information and belief, Defendant entered into additional FAS contracts prior to its purported termination of the Advisor Agreement for which Boismenu is also owed a percentage under the Advisor Agreement.

158.     As of June 3, 2022 (seven days following Defendant's service of the purported Termination Letter), Boismenu had earned additional tokens.

159.     Ferrum Network's refusal to transfer the tokens when owed was a further breach of the Advisor Agreement.

160.     Ferrum Network's continued refusal to pay the value of these tokens is in derogation of its obligations under the Advisor Agreement.

161.     Ferrum Network's actions have damaged Boismenu in an amount of at least $1,459,959.44 to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Breach of Covenant of Good Faith and Fair Dealing

162.     Boismenu incorporates by reference each and every allegation contained above as though fully set forth herein.

163.     Upon information and belief, Ferrum Network attempted to hide the dates of its token receipt from Boismenu to frustrate his ability to seek token transfer when owed.

164.     Ferrum Network continued to hide this information even as Boismenu sent written requests for his share of earned token on an almost monthly basis.

165.     Ferrum Network, its principals and its inhouse legal consultant then attempted to deceive Boismenu by sending a contractually invalid and backdated termination notice.

166.     Even if Ferrum Network's failure to send timely a termination notice were not a breach of the Advisor Agreement, its decision to wait two months after termination to send such notice is a breach of the covenant of good faith and fair dealing.

167.     If Ferrum Network had informed Boismenu of its decision to terminate in a timely manner, Boismenu could have settled accounts with Ferrum Network and sold his tokens before they lost additional value.

168.     By hiding its "decision" for nearly two months, Ferrum Network acted dishonestly to materially impair the value of Boismenu's owed token under the Advisor Agreement.

169.     Defendant orchestrated this delay to both swindle Boismenu out of the value of earned tokens and to attempt to prematurely cut off Boismenu's receipt of additional tokens.

170.     Defendants' actions have damaged and continue to damage Boismenu in amount of no less than $1,459,959.44 to be determined at trial.

## THIRD CLAIM FOR RELIEF
### Conversion

171.     Boismenu incorporates by reference each and every allegation contained above as through fully set forth herein.

172.     Boismenu was and remains the rightful owner of tokens earned under the Advisor Agreement and held by Ferrum Network.

173.     Ferrum Network improperly failed to transfer these tokens to Boismenu when due and continues to exercise control over Boismenu's tokens despite demand.

174.     Ferrum Network's refusal to return Boismenu's tokens has interfered with Boismenu's lawful possessory rights to the tokens, including the ability to sell the token.

175.     By the foregoing, Ferrum Network has converted Boismenu's tokens.

176.     Boismenu has been damaged by Defendant's actions in amount of no less than $1,459,959.44 to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**

177.    Boismenu incorporates by reference each and every allegation contained above as though fully set forth herein.

178.    Ferrum Network was enriched by receipt of Boismenu's services and at Boismenu's expense, including for nearly two months of services going from April 8, 2022 to May 27, 2022.

179.    It was against equity and good conscience for Ferrum Network to obtain the value of tokens rightfully owed to Boismenu as compensation for these services.

180.    By the foregoing, Boismenu has been damaged by Defendant's actions in amount of no less than $1,459,959.44, plus disgorgement of profits, to be determined at trial.

### FIFTH CLAIM FOR RELIEF
**Negligent Misrepresentation**

181.    Boismenu incorporates by reference each and every allegation contained above as though fully set forth herein.

182.    Ferrum Network had a duty to provide accurate information to Boismenu about the dates of its receipt of tokens as Boismenu was necessarily in a relation of trust with Ferrum Network.

183.    However, Ferrum Network repeatedly withheld this information and continues to misrepresent its token receipts.

184.    Moreover, Ferrum Network attempted to send a contractually invalid and backdated termination to take advantage of token price movement and harm Boismenu.

185.    Ferrum Network knew that Boismenu needed the token receipt information to confirm when he earned token for services provided to Ferrum Network.

186. Ferrum Network hid this information and backdated its termination knowing that Boismenu had to rely on Ferrum Network for this information.

187. Boismenu has been damaged by Defendant's actions in amount of no less than $1,459,959.44 and punitive damages to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### Fraud Against Ferrum Network

188. Boismenu incorporates by reference each and every allegation contained above as though fully set forth herein.

189. Defendant made several promises to induce Boismenu's entry into the Advisor Agreement, including claims that Boismenu would receive a significant return on his investment.

190. Boismenu reasonably relied on these representations as Ferrum Network has peculiar knowledge, *inter alia*, of the company's operations, cash flow, receipt of tokens and other compensation from clients, discussions with investors, and competitive landscape.

191. Ferrum Network also made misrepresentations regarding timing of token payments and the mechanics of transfer of Boismenu's 15% payments.

192. Separate from the Advisor Agreement, Defendant also induced Boismenu to invest personal funds in Ferrum Network.

193. Defendant made several promises regarding these investments including written statements that the value of Plaintiff's personal investments would recover and that the Ferrum Network token would "definitely get back to $1 once main net is out.".

194. Defendant knew that Boismenu would rely on these statements to induce Boismenu to provide advisory work and capital investment to Ferrum Network.

195. Boismenu did rely on these statements in providing advisory work and six figures of capital investment.

196.    Ferrum Network had a duty to provide accurate information to Boismenu about the dates of receipt of tokens as Boismenu and its intentions regarding payments to Boismenu.

197.    However, Ferrum Network repeatedly withheld this information.

198.    Moreover, Ferrum Network withheld the information regarding Boismenu's purported requirements to attend meetings or perform other tasks that it later asserted as alleged bases for non-payment of earned fees.

199.    In addition, Ferrum Network hid its undisclosed intention to withhold token at its whim, if Ferrum Network decided it was "unfair."

200.    Most critically, Ferrum Network hid its intention to terminate Boismenu until two months after the fact, in an attempt to obtain two months of services from Boismenu without compensation while also taking advantage of a token price drop.

201.    Ferrum Network also continues to misrepresent and attempt to conceal its receipt of tokens to Boismenu's detriment.

202.    Boismenu has been damaged by Ferrum Network's actions in amount of no less than $1,573,959.44 and punitive damages to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Patrick Boismenu requests the Court issue an order entering judgment in his favor, and against Defendant Ferrum Network., and:

1. On Boismenu's claim for breach of contract, entering judgment finding that Ferrum Network's notice of termination is invalid and awarding monetary damages in an amount no less than the value of all tokens owed to Boismenu, valued in each instance as of the date of Ferrum Network's breach in failing to transfer the tokens, an amount believed to be no less than $1,459,959.44, to be determined at trial;

2. On Boismenu's claim for breach of covenant of good faith and fair dealing, entering judgment finding that Ferrum Network's notice of termination is invalid and awarding monetary damages in an amount no less than the value of all tokens owed to Boismenu, valued in each instance as of the date of Ferrum Network's breach in failing to transfer the tokens, an amount believed to be no less than $1,459,959.44, to be determined at trial;

3. On Boismenu's claim for conversion, entering judgment and awarding monetary damages in an amount no less than the highest intermediate value of the tokens owed to Boismenu from the date of Ferrum Network's breach in failing to transfer the token to Boismenu, an amount believed to be no less than $1,459,959.44, to be determined at trial;

4. On Boismenu's claim for unjust enrichment, entering judgment and awarding monetary damages in an amount equal to the value of tokens owed to Boismenu an amount believed to be no less than $1,459,959.44, plus disgorgement of profits, to be determined at trial;

5. On Boismenu's claim for negligent misrepresentation, entering judgment and awarding monetary damages in an amount of no less than the highest intermediate value of the tokens owed to Boismenu from the date of Ferrum Network failed to transfer tokens, an amount believed to be no less than $1,459,959.44, plus punitive damages, to be determined at trial;

6. On Boismenu's claims for fraud against Ferrum Network, entering judgment and awarding monetary damages in an amount of no less than the highest intermediate value of the tokens owed Boismenu from the date Ferrum Network, or Friend, failed to transfer the token, (an amount believed to be no less than $1,573,959.44, plus punitive damages, to be determined at trial) plus, consequential damages, and attorneys' fees and costs;

7. Awarding pre-judgment interest at nine percent (9%) on all claims and post-judgment interest as provided for under applicable Federal Rules; and

8. Ordering or awarding any other such relief that the Court deems just and proper.

## REQUEST FOR JURY TRIAL

Boismenu respectfully requests a trial by jury on all issues so triable.

Dated:        January 10, 2022
              New York, New York

                              Respectfully submitted,

                              **ROMANO LAW PLLC**

                              By: _____
                                  Siddartha Rao
                                  Marc D. Ostrow
                              55 Broad Street, 18th Floor
                              New York, New York 10004
                              Phone: (212) 865-9848
                              Email: sid@romanolaw.com
                                     marc@romanolaw.com

                              *Attorneys for Plaintiff Patrick Boismenu*

25