UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
PATRICK BOISMENU,                                              :
                                                               :
                                    Plaintiff,                 :        REPORT AND
                                                               :        RECOMMENDATION
                       -against-                               :
                                                               :        No. 23-CV-0170-OEM-JRC
IRONWORKS BVI, LTD. a/k/a IRONWORKS                            :
TRADING, LTD. d/b/a FERRUM NETWORK,                            :
                                                               :
                                    Defendant.                 :
                                                               :
------------------------------------------------------------------x
JAMES R. CHO, United States Magistrate Judge:

     Plaintiff Patrick Boismenu ("plaintiff" or "Boismenu") brings this diversity action for, *inter*

*alia*, breach of contract and unjust enrichment against defendant Ironworks BVI, Ltd. a/k/a

Ironworks Trading, Ltd. d/b/a Ferrum Network ("defendant" or "Ironworks") for failing to make

payments due and owing to plaintiff under a consulting contract.  *See* Compl., Dkt. 1.  Currently

before this Court, on referral from the Honorable Orelia E. Merchant, is plaintiff's motion for

default judgment against defendant Ironworks.  *See* Mot. for Default J., Dkt. 16.  For the reasons

set forth below, this Court respectfully recommends granting plaintiff's motion.

**I.      Factual Background**

     Plaintiff is a citizen of Canada, who currently resides in Cairo, Egypt.  *See* Compl. ¶ 35.

Defendant Ironworks is a British Virgin Islands corporation, whose founding members and key

team members work from New York City in this District.  *See id.* ¶¶ 36, 40.

     Plaintiff has decades of experience in the fields of cryptography and cryptocurrencies.[1]  *See*

---

[1] A "cryptocurrency" or "token" refers to "units of computer code, created by private computer
programmers, that may be used as forms of currency by some private individuals. . . .  Although
certain types of cryptocurrency may be used as currency, cryptocurrencies are fundamentally
private-sector technologies, computer codes, and software applications."  *Tucker v. Chase Bank
USA, N.A.*, 399 F. Supp. 3d 105, 108 (S.D.N.Y. 2019) (internal citations and quotations omitted);
*see Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 201-02 (S.D.N.Y. 2023) ("a
'cryptocurrency,' crypto asset, or token is a digital asset created and traded in the digital world that

*id.* ¶ 2.  Plaintiff specializes in "developing token metrics and creating the token lifecycle and the economy of the token."  Declaration of Patrick Boismenu ("Boismenu Decl.") ¶ 5, Dkt. 20. Ironworks, an early-stage startup, purports to be "a leader in blockchain interoperability using an 'Infinity Layer Mainnet' and 'Quantum Portal' to facilitate deployment of smart contracts[2] across networks."  *Id.* ¶¶ 3, 49.  Ironworks also offers a "decentralized finance ('DeFi') product named 'Crucible,' advertising a fifty percent (50%) annual percentage yield to consumers who buy and stake Ferrum Network tokens."  *Id.* ¶ 50.

In the beginning of 2021, Ironworks hired plaintiff as a "Senior Advisor" pursuant to a "Senior Advisor Agreement," dated January 25, 2021, "to create metrics and assist in finalizing projects."  *See id.* ¶¶ 3, 5, 8-9, 52; Advisor Agreement, Dkt. 20-1; Boismenu Decl. ¶ 5. Specifically, plaintiff created virtual currency token metrics that modeled the lifecycle and economy of new currencies for Ironworks' clients.  *See* Compl. ¶ 4.

The Advisor Agreement required plaintiff to "act as an advisor to the Company" and provide "assistance with all Ferrum Advisory Services [('FAS')] clients, forming token economics, providing advisory [services] to clients in terms of the raise and marketing strategies, and other similar services the parties agree are necessary to further Company's business and marketing goals."  *Id.* ¶¶ 57-58; Advisor Agreement, Dkt. 20-1 at ECF page 2.[3]  In exchange, defendant agreed to pay plaintiff fifteen percent of the finders' fees and tokens received from Ferrum Advisory Services clients.  Compl. ¶¶ 60, 62; Advisor Agreement, Dkt. 20-1 at ECF page 2.

---

is designed to be a medium of exchange or a store of value.  Every crypto asset is powered by a decentralized digital ledger called a 'blockchain.'  Blockchains consist of 'blocks' of data that track the ownership and transfer of crypto assets on a given network.") (internal citations omitted).

[2] "Smart contracts . . . are self-executing, self-enforcing programs that write the terms of the agreement between the buyer and seller of tokens directly into the program's code."  *Risley*, 690 F. Supp. 3d at 202.

[3] References to the page numbers generated by the Court's electronic case filing system appear as "ECF page."

Specifically, the agreement states that plaintiff "shall" receive "15% of the tokens earned by the Company from its FAS business services, in accordance with the vesting schedules as agreed upon with the particular FAS clients." Compl. ¶¶ 62-63; Advisor Agreement, Dkt. 20-1 at ECF page 2. Regarding the finder's fee, the agreement provides that plaintiff receive payment in "USDT"[4] of "15% of the finder's fees sourced by Company based on the fees it generates from raising funds for FAS clients." Compl. ¶ 65; Advisor Agreement, Dkt. 20-1 at ECF page 2. The USDT funds were required to be "transferred . . . no more than three (3) days following the Company's receipt of such funds by the FAS client(s)." *Id.* ¶ 68; Advisor Agreement, Dkt. 20-1 at ECF page 2. The Advisor Agreement provided for termination "by either party for any reason upon seven (7) days prior written notice . . . ." *Id.* ¶ 70; Advisor Agreement, Dkt. 20-1 at ECF page 2. The agreement also included an integration clause providing that it "contains the entire agreement and understanding between the parties . . . and supersedes any prior or contemporaneous written or oral agreements, representations and warranties between them respecting the subject matter [of the agreement]." Compl. ¶ 72; Advisor Agreement, Dkt. 20-1 at ECF page 4. The agreement was executed by plaintiff and Ian Friend ("Friend") for "Ferrum Network." Compl. ¶ 73; Advisor Agreement, Dkt. 20-1 at ECF page 5.

Plaintiff began providing advisory services pursuant to the Advisor Agreement in January 2021. *Id.* ¶ 74. The services plaintiff provided included "assisting Ferrum Advisory Services clients, and working on token metrics, economics and strategies for fund raising and marketing." *Id.* ¶ 75. Through these services, plaintiff contributed to "Ferrum Network's advisory services generat[ing] millions of dollars to Ferrum Network." *Id.* ¶ 76.

Plaintiff notified Ironworks of the specific tokens owed to him, on a rolling basis, as of

---

[4] "USDT" refers to "Tether" a "stablecoin" or virtual currency with stable valuation, which is tied to the United States Dollar. *See id.* ¶ 66.

October 21, 2021 through March 22, 2022. *Id.* ¶ 121. On April 13, 2022, Ironworks' co-founder, Ian Friend, sent a message to Nichell Logue, Executive Vice President of Operations and plaintiff stating, "Let's discuss more on the call. But regardless of the exact figures [I] think we can all agree that it's not fair for one team member to be paid so much more than anyone else." *Id.* ¶ 124.

On May 27, 2022, Ironworks' "Legal Consultant," Michael Nacmais sent plaintiff a termination letter, claiming that Ironworks had terminated plaintiff effective April 8, 2022. *Id.* ¶ 79. In the termination letter, Ironworks offered plaintiff severance of approximately $17,000. *Id.* ¶ 82. The letter further stated that "Ferrum cannot pay someone fifteen (15%)." *Id.* ¶ 83. The letter explained that plaintiff was terminated for his failure to attend meetings, including weekly meetings for each FAS client, assisting with "client pitches," responding to client/team messages, being "very active across all Ferrum activities" and meeting "many more KPIs/deliverables that are expected of advisors." *Id.* ¶¶ 85, 87. Prior to the May 27, 2022 letter, Ironworks did not exercise its right to terminate the Advisor Agreement. *Id.* ¶ 102.

Meanwhile, the price of non-USDT tokens had been falling since around November 2021. *Id.* ¶ 105. Plaintiff alleges that Ironworks deliberately delayed issuing a termination letter to take advantage of the dropping prices of tokens, and backdated plaintiff's termination date to prevent plaintiff from earning 15 percent fees on advisory clients after the April 8 termination date. *Id.* ¶¶ 106, 111.

On June 20, 2022, plaintiff sent Ironworks a demand letter requesting a proper accounting and payment of the compensation owed to him under the Advisor Agreement, including plaintiff's calculation of the tokens owed as of April 8, 2022, which totaled more than $1 million. *Id.* ¶¶ 128-30. Ironworks failed to respond to plaintiff's demand letter, despite further inquiries by plaintiff's counsel. *Id.* ¶¶ 131-33. After counsel for plaintiff threatened litigation, Ironworks ultimately responded on September 20, 2022, claiming that Ironworks had not received tokens on FAS Client

projects. *Id.* ¶¶ 138-41.

## II.     Procedural Background

Plaintiff alleges claims for breach of contract (First Claim for Relief), breach of the covenant of good faith and fair dealing (Second Claim for Relief), conversion (Third Claim for Relief), unjust enrichment (Fourth Claim for Relief), negligent misrepresentation (Fifth Claim for Relief) and fraud (Sixth Claim for Relief).

On January 10, 2023, plaintiff commenced this action.  *See* Dkt. 1.  After service on Ironworks was purportedly effected, Ironworks failed to appear or otherwise defend the action, leading plaintiff to seek entry of default on June 29, 2023, *see* Request for Certificate of Default, Dkt. 9, which was granted on July 10, 2023, *see* Entry of Default, Dkt. 10.  On July 25, 2023, plaintiff filed his first motion for default judgment, *see* Mot. for Default J., Dkt. 11, which Judge Merchant referred to this Court for a report and recommendation, *see* Order dated July 26, 2023.

On August 9, 2023, this Court denied without prejudice plaintiff's motion for failure to comply with Local Civil Rule 7.1, which requires that "all motions shall include . . . [a] memorandum of law, setting forth the cases and other authorities relied upon in support of the motion[.]"  Order dated Aug. 9, 2023 (quoting Local Civil Rule 7.1(a)(2)).  The Court noted that plaintiff "has not submitted any argument in support of his motion for default judgment."  *Id.*  In addition, the Court cautioned plaintiff that "in any renewed motion for default judgment, plaintiff must prove his damages with evidentiary submissions."  *Id.*

On October 26, 2023, plaintiff filed a second motion for default judgment, which Judge Merchant referred to this Court.  *See* Dkt. 16; Order dated Oct. 27, 2023.  Plaintiff's counsel submitted a declaration from plaintiff attesting to the damages sought and providing a spreadsheet of the virtual currency payments he alleges defendant owes him.  *See* Dkt. 20.  However, although plaintiff facially complied with Local Civil Rule 7.1 by submitting a memorandum of law in

support of this second motion, inexplicably, the memorandum contained no analysis of defendant's liability or support for plaintiff's request for damages.  *See* Dkt. 19.

On December 15, 2023, this Court issued an order identifying certain deficiencies in plaintiff's proof of service of process.  *See* Order dated Dec. 15, 2023.  Specifically, the Court noted that process was served upon Carol Friend, who the process server states that he "knew . . . to be the managing agent of the corporation," without stating the basis for his knowledge.  *Id.* Accordingly, the Court directed plaintiff to supplement the process server's affidavit of service setting forth the basis for the process server's knowledge that Ms. Friend is a managing agent of the corporate defendant.  *Id.*  On December 28, 2023, plaintiff filed the supplemental affidavit of his process server, who avers that:  "I was met by Carol Friend upon my arrival, who identified herself as managing agent of the corporate Defendant."  Aff. of Patricia McHale Eosso ¶ 4, Dkt. 23-2.

On May 7, 2024, the Court held a hearing on the motion for default judgment, at which defendant failed to appear.  At the hearing, the Court directed plaintiff to further supplement his motion for default judgment with documentary evidence supporting his claim for damages, and to specify the amount sought for pre-judgment interest and costs, supported by relevant documents and calculations.  *See* Min. Entry dated May 7, 2024.  On May 21, 2024, plaintiff supplemented his motion with additional documents in support of his request for damages, including calculations of pre-judgment interest.  *See* Dkt. 27.

**III.    Discussion**

    **A.    Liability**

        **1.    Default Judgment Standard**

Rule 55 of the Federal Rules of Civil Procedure governs motions for default judgment.  The Rule sets forth a two-step process for entry of a default judgment.  *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95-96 (2d Cir. 1993).  First, the Clerk of the Court enters the default

pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case. *See id.*; *see also* Fed R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."). This first step is nondiscretionary. *See United States v. Conolly*, 694 F. App'x 10, 12 (2d Cir. 2017). Second, after the Clerk of the Court enters a default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the plaintiff may apply to the court for a default judgment. *See* Fed. R. Civ. P. 55(b)(2).

Here, after defendant failed to respond to the Complaint, the Clerk of the Court entered a default against defendant Ironworks. To date, defendant Ironworks has not appeared or moved to vacate the entry of default.

When evaluating a plaintiff's application for a default judgment, "a court is required to accept all [] factual allegations as true and draw all reasonable inferences in [plaintiff's] favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). "Nevertheless, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." *Labarbera v. ASTC Lab'ys., Inc.*, 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010) (internal quotations and citations omitted); *see also TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd.*, 536 F. App'x 45, 46 (2d Cir. 2013) ("[P]rior to entering default judgment, a district court is required to determine whether the plaintiff's allegations establish the defendant's liability as a matter of law.") (internal quotations and citations omitted).

"Default judgments are 'generally disfavored and are reserved for rare occasions.'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 129 (2d Cir. 2011) (quoting *Enron Oil*, 10 F.3d at 96). Providing guidance as to when a default judgment is appropriate, the Second Circuit has cautioned that since a default judgment is an extreme remedy, it should only be entered as a last resort. *See Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has

recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "afford[] litigants a reasonable chance to be heard." *Enron Oil*, 10 F.3d at 95-96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," doubts should be resolved in favor of the defaulting party. *See id*. at 95. Accordingly, a plaintiff is not entitled to a default judgment as a matter of right simply because a defendant is in default. *See Erwin DeMarino Trucking Co. v. Jackson*, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

A default serves as the defendant's admission that the complaint's well-pleaded factual allegations are true. *See Mickalis Pawn Shop*, 645 F.3d at 137; *Finkel*, 577 F.3d at 84 (after default the "court is required to accept all of the [plaintiff's] [well-pleaded] allegations as true and draw all reasonable inferences in its favor."). A fact is not considered "well-pleaded," however, "if it is inconsistent with [the] other allegations of the complaint or with facts of which the court can take judicial notice, or is contrary to uncontroverted material in the file of the case." *Hop Hing Produces Inc. v. Lin Zhang Trading Co., Inc.*, No. 11-CV-3259, 2013 WL 3990761, at *3 (E.D.N.Y. Aug. 5, 2013) (internal quotations and citations omitted). Ultimately, whether to grant a motion for default judgment is "left to the [court's] sound discretion." *Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 615 (2d Cir. 1999); *Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. D & A Bus Co.*, 270 F. Supp. 3d 593, 606 (E.D.N.Y. 2017).

Here, Ironworks did not respond to the Complaint despite proper service on its authorized agent. Plaintiff also filed affidavits confirming service of the motion for default judgment, this Court's Order scheduling a hearing on the motion, and the minute entry for the conference. *See* Dkts. 21, 22, 26, 28; *see also* Dkt. 24 (certificate of service of December 15, 2023 Order denying

first motion for default judgment). Ironworks has nonetheless failed to respond to plaintiff's motion for default judgment or otherwise appear in this action. Accordingly, this Court recommends finding that Ironworks' failure to answer or otherwise respond to the Complaint constitutes an admission of the factual allegations therein, and now proceeds to consider whether those facts establish Ironworks' liability.

### 2.    Breach of Contract

The Advisor Agreement provides that New York law governs the agreement. *See* Advisor Agreement, Dkt. 20-1 at ECF page 4. "In a contract dispute, New York courts will generally honor a choice-of-law provision in an agreement" between the parties. *Scharnikow v. Siracuse*, No. 15-CV-6991, 2016 WL 7480360, at *3 (E.D.N.Y. Dec. 6, 2016), *report and recommendation adopted*, 2016 WL 7480364 (E.D.N.Y. Dec. 29, 2016); *see Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000).

"To state a claim for breach of contract under New York law, 'the complaint must allege: [1] the formation of a contract between the parties; [2] performance by the plaintiff; [3] failure of defendant to perform; and [4] damages.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

Here, the well-pleaded allegations in the Complaint, accepted as true, establish Ironworks' liability for breach of contract. First, plaintiff established that the parties entered into an enforceable agreement on January 25, 2021. Second, plaintiff performed his obligations under the Advisor Agreement by providing advisory services to Ironworks, but Ironworks failed to pay plaintiff the compensation provided for in the agreement. Further, plaintiff alleges that because of the delay in the payment of tokens, which have dropped in value since around November 2021, he has suffered further losses. The Court, therefore, concludes that plaintiff has properly alleged a breach of contract claim based on Ironworks' failure to pay plaintiff the amounts due under the

Advisor Agreement.

It appears from plaintiff's default submissions that he seeks entry of judgment and damages only on his breach of contract claim. For example, in plaintiff's declaration, he states that "I am seeking damages contractually owed to me under the Senior Advisor Agreement . . . ." Boismenu Decl. ¶ 2; *see id.* ¶ 27 ("When all Projects and associated amount[s] due are calculated, the total amount contractually owed to me is $1,059,084.44."); Proposed J., Dkt. 17 (seeking $1,059,084.44 in damages). As discussed below, all of plaintiff's other claims are largely reformulated versions of his breach of contract claim. Any ambiguity as to the scope of plaintiff's default motion is compounded by plaintiff's failure to discuss defendant's liability on any of the causes of action asserted in the Complaint. Nonetheless, out of an abundance of caution, the Court briefly discusses why the remaining claims should be dismissed.

> ### 3. Duplicative Claims – Breach of the Covenant of Good Faith and Fair Dealing, Conversion, Unjust Enrichment, Negligent Misrepresentation and Fraud

Plaintiff brings various claims that are based on the same facts as those underlying his breach of contract claim: breach of the covenant of good faith and fair dealing, conversion, unjust enrichment, negligent misrepresentation and fraud. However, where, as here, the additional claims are "controlled by contract" and the same relief is sought in a breach of contract claim, those claims are properly dismissed as duplicative. *See Fometal S.R.L. v. Keili Trading LLC*, No. 22-CV-1928, 2022 WL 17485317, at *2-*3 (S.D.N.Y. Dec. 7, 2022) (recommending dismissal of conversion, unjust enrichment, tortious interference and fraud claims as duplicative of breach of contract claim); *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014) (citation omitted). "[C]laims are duplicative of one another if they arise from the same facts and do not allege distinct damages." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (citations omitted); *see Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d

861, 869 (2d Cir. 2015).

    *i.*  *Breach of Covenant of Good Faith and Fair Dealing*

   The covenant of good faith and fair dealing is implied in all contracts and constitutes "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (internal quotation marks and citation omitted); *see Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006). "[A]n implied-covenant [contractual] claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract." *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 93 (S.D.N.Y. 2018). "[I]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Id.* (citation omitted).

   Similar to his breach of contract claim, plaintiff alleges that defendant breached the covenant by taking various actions that were inconsistent with the terms of the Advisor Agreement. *See* Compl. ¶¶ 163-66 ("attempt[ing] to hide the dates of its token receipt from Boismenu to frustrate his ability to seek token transfer when owed"; "sending a contractually invalid and backdated termination notice"). Thus, plaintiff's implied-covenant claim arises out of the same facts as his express contract claim and is therefore duplicative. *See Deutsche Bank*, 810 F.3d at 869; *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 288 (S.D.N.Y. 2023). To the extent the implied covenant claim differs at all from the breach of contract claim, since the damages sought on the implied covenant claim are identical to the damages sought for the alleged

breach of contract, this Court recommends dismissal of the implied covenant claim as duplicative. *See EFG Bank*, 309 F. Supp. 3d at 93-94.

### ii.    Unjust Enrichment

Similarly, plaintiff's unjust enrichment claim is duplicative of the breach of contract claim because it arises from the same facts and alleges the same damages. "[T]o succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that '(1) defendant was enriched[;] (2) at plaintiff's expense[;] and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover[.]" *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (quoting *Brairpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)). However, if the "matter is controlled by contract" and the same relief is sought for unjust enrichment as for breach of contract, the unjust enrichment claim is properly dismissed as duplicative. *Marshall*, 51 F. Supp. 3d at 471 (citation omitted).

Here, plaintiff's unjust enrichment claim arises from the same facts and seeks the same relief as his breach of contract claim. *Compare* Compl. ¶¶ 160-61, *with id*. ¶¶ 178-80. This Court, therefore, respectfully recommends dismissing plaintiff's claim for unjust enrichment. *See BASF Corp. v. The Original Fender Mender, Inc.,* No. 23-CV-2796, 2024 WL 3740439, at *8 (E.D.N.Y. Aug. 10, 2024); *LG Capital Funding, LLC v. Ubiquity, Inc*., No. 16-CV-3102, 2017 WL 3173016, at *3 (E.D.N.Y. May 12, 2017), *report and recommendation adopted,* 2017 WL 3168961 (E.D.N.Y. July 25, 2017); *Scharnikow v. Siracuse*, No. 15-CV-6991, 2016 WL 7480360, at *4 (E.D.N.Y. Dec. 6, 2016), *report and recommendation adopted*, 2016 WL 7480364 (E.D.N.Y. Dec. 29, 2016); *Cont'l Cas. Co. v. Contest Promotions NY, LLC*, No. 15-CV-501, 2016 WL 1255726, at *3-*4 (E.D.N.Y. Mar. 28, 2016).

### iii.    Conversion

In New York, conversion is "the unauthorized assumption and exercise of the right of

ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff*, 460 F.3d at 403-04.  To establish a claim for conversion, a plaintiff must show that:  "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).  However, even if a plaintiff meets all of the elements of a conversion claim, courts still dismiss a conversion claim if it is duplicative of a breach of contract claim.  *See Command Cinema Corp. v. VCA Lab'ys, Inc.*, 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006); *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 431 (S.D.N.Y. 2004) (noting that a conversion claim may be dismissed as duplicative of a contract claim even though the conversion claim "satisf[ies] the technical elements of that tort") (internal quotation marks and citation omitted).  Thus, as with the other claims discussed above, "[a] conversion claim may only succeed if the party alleges a wrong that is distinct from any contractual obligations." *Command Cinema Corp.*, 464 F. Supp. 2d at 199; *see Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 170 (D. Conn. 2005) ("Where plaintiffs have merely repeated . . . their breach of contract claims and called them conversions, the conversion claims must fail."); *Reade v. SL Green Operating P'ship, LP*, 817 N.Y.S.2d 230, 231 (1st Dep't 2006) ("a tort cause of action that is based upon the same facts underlying a contract claim will be dismissed as a mere duplication of the contract cause of action.").  In addition, a conversion claim will "be deemed redundant when damages are merely being sought for breach of contract." *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996) (internal quotation marks omitted); *see Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc.*, No. 07-CV-10490, 2009 WL 855648, at *10 (S.D.N.Y. Mar. 25, 2009).

First, the same facts form the basis for plaintiff's contract and conversion claims. In both claims, plaintiff alleges that defendant acted wrongfully by withholding tokens that contractually belonged to him. Second, based on these overlapping allegations, both the conversion and breach of contract claims seek the same damages. Thus, the conversion claim should also be dismissed. *See Flatscher v. Manhattan Sch. of Music*, 551 F. Supp. 3d 273, 288 (S.D.N.Y. 2021).

### iv.    Negligent Misrepresentation

A claim for negligent misrepresentation under New York law requires that the plaintiff allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co.*, Inc., 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Invs., Inc. v. Traflagar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)); *see J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007). However, when such a claim is brought in conjunction with a breach of contract claim, the acts alleged must be based upon breaches of legal duties extraneous to and distinct from the contract. *See MVP Health Plan, Inc. v. OptumInsight, Inc.*, 765 F. App'x 615, 617 (2d Cir. 2019); s*ee Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389-90 (1987). "It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick*, 70 N.Y.2d at 389.

Here, plaintiff essentially alleges that the parties' relationship was formed by contract (Advisor Agreement), but that defendant performed the contract negligently. *See Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 550-51 (1992). Specifically, plaintiff alleges that Ironworks had a duty to provide plaintiff with accurate information about its receipt of tokens, which necessarily

arises out of Ironworks' contractual duty to pay plaintiff "15% of the tokens earned by the Company from its FAS business services."  Compl. ¶¶ 62, 182.  Plaintiff further alleges that Ironworks "repeatedly withheld this information and continues to misrepresent its token receipts." *Id.* ¶ 183.  These allegations are merely a restatement, albeit in slightly different way, of the breach of contract claim alleged herein.  Plaintiff further alleges that Ironworks "attempted to send a contractually invalid and backdated termination to take advantage of token price movement . . . ." *Id.* ¶ 184.  Similarly, plaintiff alleges that defendant breached the Advisor Agreement by sending a termination notice that was ineffective as it did not comply with the terms of the Advisor Agreement.  *Id.* ¶¶ 148-52.  Thus, plaintiff's negligent misrepresentation claim alleges violations of duties indivisible from the contractual obligations allegedly breached by defendant.  *See MVP Health Plan*, 765 F. App'x at 617.  Because the allegations of negligent misrepresentation parallel the breach of contract claim, this Court recommends dismissal of the misrepresentation claim.[5]

### v.    Fraud

Plaintiff asserts a claim for fraud in the inducement of the Advisor Agreement based on defendant's representations that plaintiff "would receive a significant return on his investment" and representations as to the timing and mechanics of the 15 percent payments to plaintiff.  Compl. ¶¶ 189, 191.  Defendants also withheld information regarding the dates of receipt of tokens.  *Id.* ¶¶ 196-97.  Plaintiff further alleges that Ironworks "hid its intention to terminate Boismenu until two months after the fact, in an attempt to obtain two months of services from Boismenu without

---

[5] Although plaintiff seeks punitive damages in connection with his negligent misrepresentation claim that he could not recover as contract damages, *see* Compl. ¶ 187, "punitive damages are not available in the ordinary fraud and deceit case," *see Trepel v. Abdoulaye*, 185 F. Supp. 2d 308, 311 (S.D.N.Y. 2002).  Rather, where a request for punitive damages arises out of the contractual relationship between the parties, a plaintiff must show that defendant's conduct was "part of a pattern of behavior aimed at the public generally."  *N.Y.U. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995).  Here, plaintiff has not alleged that defendant directed its conduct at the public generally. Thus, punitive damages are not available with respect to plaintiff's negligent misrepresentation claim.

compensation while also taking advantage of a token price drop." *Id.* ¶ 200.  Finally, plaintiff also alleges that defendant induced him to invest his personal funds with Ironworks.  *Id.* ¶ 192. Defendant made several promises regarding these investments, including that plaintiff's personal investments would recover and that the Ferrum Network token would "definitely get back to $1 once main net is out." *Id.* ¶ 193.

To state a fraudulent inducement claim under New York law, a plaintiff must allege that: (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.  *See Eternity Glob. Master Fund, Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004); *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986).

In federal court, under Rule 9(b) of the Federal Rules of Civil Procedure, plaintiff must also "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frei v. Taro Pharms. U.S.A., Inc.*, 443 F. Supp. 3d 456, 470 (S.D.N.Y. 2020), *aff'd*, 844 F. App'x 444 (2d Cir. 2021); *see Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). For a fraudulent omission claim, plaintiff must also allege "that the defendant had a duty to disclose the material information." *Unicredito Italiano SPA v. JP Morgan Chase Bank*, 288 F. Supp. 2d 485, 497 (S.D.N.Y. 2003).  A duty to disclose arises in one of three circumstances:  where the parties are in a fiduciary relationship, under the special facts doctrine, where one party possesses superior knowledge, or where a party has made a partial or ambiguous statement, whose full meaning will only be made after complete disclosure.  *Aetna Cas. & Sur. Co. c. Aniero Concrete Co., Inc.*, 404 F.3d 566, 582 (2d Cir. 2005); *see Lerner*, 459 F.3d at 292.  Such claims "must pass muster under Rule 9(b)." *Aetna*, 404 F.3d at 582.

16

Where, as here, a fraud claim is asserted with a breach of contract claim, plaintiff must "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted).

Based on the allegations in the Complaint, the Court finds plaintiff's fraud claims lacking. First, with respect to plaintiff's claims of fraudulent inducement, plaintiff has not alleged representations that are "collateral or extraneous to the contract," nor has plaintiff alleged the existence of a separate duty or special damages arising from the alleged misrepresentations not covered by the contract claim. *Id.* "Where a plaintiff alleges . . . that the defendant simply misrepresented its intent to perform under a contract, no separate contract claim for fraud will lie, and plaintiff must instead bring an action for breach of contract." *Spinelli v. NFL*, 903 F.3d 185, 209 (2d Cir. 2018); *Fometal S.R.L.*, 2022 WL 17485317, at *3.

Plaintiff alleges that defendant made misrepresentations as to the compensation he would receive (and when) in exchange for providing services under the Advisor Agreement. *See* Compl. ¶ 189 ("Defendant made several promises to induce Boismenu's entry into the Advisor Agreement, including claims that Boismenu would receive a significant return on his investment."), ¶ 191 ("Ferrum Network also made misrepresentations regarding timing of token payments and the mechanics of transfer of Boismenu's 15% payments."). Thus, plaintiff's claim for fraudulent inducement into the Advisor Agreement amounts to the allegation that defendant never intended to fulfill its contractual obligations. *See ADYB Engineered for Life, Inc., v. Edan Admin. Servs. Ltd.*, No. 19-CV-7800, 2021 WL 1177532, at *22 (S.D.N.Y. Mar. 29, 2021) (dismissing fraud claim as duplicative where it alleged that party misrepresented that he "intended to fulfill his obligations"

17

under contract).

Moreover, to distinguish a breach of contract claim from a fraud claim, the misrepresentations underlying the fraud claim must implicate a "material existing fact," rather than a promise as to the future. *See Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992); *M-101, LLC v. iN Demand L.L.C.*, No. 06-CV-12938, 2007 WL 4258191, at *3 (S.D.N.Y. Dec. 3, 2007). Here, plaintiff alleges only that defendant made misrepresentations as to what would happen in the future (how much and when he would be paid), including that aspect of the fraudulent inducement claim that related to plaintiff investing his personal funds in Ferrum Network. *See* Compl. ¶ 193 ("Defendant made several promises regarding these investments including written statements that the value of Plaintiff's personal investments would recover and that the Ferrum Network token would 'definitely get back to $1 once main net is out.'"), ¶ 199 ("Ferrum Network hid its undisclosed intention to withhold token at its whim . . . .").

Aside from those allegations of fraud that are inextricably intertwined with and duplicative of plaintiff's breach of contract claim, plaintiff further alleges that "Defendant's co-founders and officers Friend and Naiem Yeganeh [("Yeganeh")] also fraudulently induced Boismenu's personal investments into Ferrum Network projects." Compl. ¶ 26. However, plaintiff's allegations lack the requisite particularity as to time, place, manner and content of the alleged statements. For example, plaintiff alleges that "Friend persuaded Boismenu to invest Boismenu's personal funds into Ferrum projects by promising Boismenu significant returns." *Id.* ¶ 27. Similarly, "Yeganeh personally encouraged Boismenu's investments in Ferrum Network, promising a significant return on Boismenu's investment." *Id.* ¶ 28. Plaintiff has not described when, where or how Friend or Yeganeh persuaded Boismenu to invest his personal funds. The allegations are insufficient to sustain a fraud claim under Rule 9(b). *See Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, 616 F. Supp. 3d 291, 312-14 (S.D.N.Y. 2022) (allegation of misrepresentation made in year "prior

18

to" payment too broad); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-CV-5334, 2014 WL 1311979, at *5 (E.D.N.Y. Mar. 28, 2014) ("at some point between May and June 2011" insufficient to satisfy Rule 9(b)); *Anwar v. Fairfield Greenwich Ltd.*, 826 F. Supp. 2d 578, 586 (S.D.N.Y. 2011) (claims that "do not allege where the misstatements were made, and only once . . . allege an approximate time frame" fail under Rule 9(b)). Further, plaintiff has not plausibly alleged that Friend and Yeganeh intended to defraud him or knew that the representations of a significant return on plaintiff's investment were false at the time they were made. *See Eternity Glob. Master Fund*, 375 F.3d at 187; *42-50 21st St. Realty LLC v. First C. Sav. Bank*, No. 20-CV-5370, 2022 WL 1004187, at *4-*5 (E.D.N.Y. Apr. 4, 2022). Thus, this Court recommends dismissal of plaintiff's fraud claims.

### B.    Damages

Although the allegations of a complaint pertaining to liability are deemed admitted upon entry of a default judgment, allegations relating to damages are not. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)). "Because the extent of the damages pleaded by a plaintiff is not deemed to be established by the default, the Court must conduct 'an inquiry in order to ascertain the amount of damages with reasonable certainty.'" *Trs. of Loc. 7 Tile Indus. Welfare Fund v. All Flooring Sols., LLC*, No. 19-CV-126, 2020 WL 9814088, at *3 (E.D.N.Y. Feb. 12, 2020) (quoting *Credit Lyonnais Secs. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). A court may make this determination based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence. *See* Fed. R. Civ. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991).

Having found that the Complaint establishes defendant's liability for breach of contract, the Court now addresses the damages plaintiff is entitled to recover for that claim. Under New York

law, it is well settled that "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms." *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) (citation omitted); *see LG Capital Funding, LLC v. Wowio, Inc.*, No. 16-CV-6632, 2018 WL 3202077, at *10 (E.D.N.Y. Apr. 24, 2018), *report and recommendation adopted*, 2018 WL 2224991 (E.D.N.Y. May 15, 2018).

      In this case, plaintiff seeks a principal damage award of $1,059,084.44 based on the value of virtual currency tokens owed to him by defendant as of April 8, 2022, the date of his termination. As discussed above, the Advisor Agreement provides for defendant to pay plaintiff 15 percent of its collected finder's fees and 15 percent of the tokens received from defendant's clients as compensation for plaintiff's advisory services. *See* Dkt. 20-1 at ECF page 2. Plaintiff has also submitted an exemplar of one of the underlying client advisory agreements upon which plaintiff's compensation was based, between Ironworks and Babylon, setting forth the amount of tokens and the finder's fee that Babylon was required to pay Ironworks for its advisory services.[6] *See* Dkt. 27-1. In that example, Babylon agreed to pay Ironworks 2.5 percent of all tokens and a finder's fee in the amount of 5 percent of all funds raised by Ironworks. *Id.* at ECF page 4. Based on plaintiff's submissions, defendant failed to pay plaintiff 15 percent of the tokens received from Babylon between January 2022 and June 2022, in six installments, totaling 438,750 tokens (73,125 tokens x 6). *See* Dkt. 27-2 at ECF page 12; Dkt. 20-2 at ECF page 2. At a token price of $0.06280 as of April 8, 2022, plaintiff is owed $27,553.50 (438,750 tokens x $0.06280) for the Babylon project. *See* Dkt. 20-2 at ECF page 2; Dkt. 27-2 at ECF page 12.

      According to plaintiff, as of the date of his termination, he was owed at least $1,059,084.44

---

[6] Plaintiff's counsel represents that plaintiff "possess[es] each of the agreements between [Ironworks] and its clients that offer further proof of the outstanding debts owed to the Plaintiff." *See* Dkt. 27 at ECF page 1.

in total USDT, a virtual currency based on the U.S. dollar.[7]  Plaintiff has provided a composite spreadsheet that lists the name of each project that he worked on, the token amount he is owed for work performed on each project, and the value of each token as of the date of his termination.  *See* Boismenu Decl. ¶¶ 15-19; Dkt. 20-2 at ECF page 2.  Plaintiff used a third-party website, www.coingecko.com, to obtain the average daily price of each project token value as of April 8, 2022.  *See* Boismenu Decl. ¶ 20; *see also Jing v. Sun*, No. 21-CV-2350, 2022 WL 1505950, at *21 (E.D.N.Y. Jan. 4, 2022) (relying on plaintiff's affidavit for value of cryptocurrency).[8]

Column "A" lists the name of the cryptocurrency project plaintiff handled for Ironworks. Boismenu Decl. ¶ 15; Dkt. 20-2 at ECF page 2.  Column "C" reflects the number of tokens Ironworks owed plaintiff for the specified cryptocurrency project pursuant to the Advisor Agreement.  Boismenu Decl. ¶ 17; Dkt. 20-2 at ECF page 2.  Column "E" lists the value as of April 8, 2022 of each project token.  Boismenu Decl. ¶¶ 19-20; Dkt. 20-2 at ECF page 2.  Column "F" reflects the amount due to plaintiff for outstanding finder's fees for a particular project pursuant to paragraph 2(a) of the Advisor Agreement.  Boismenu Decl. ¶ 21; Dkt. 20-2 at ECF page 2.  Column "G" lists the total amount owed to plaintiff for each project.  Boismenu Decl. ¶ 22; Dkt. 20-2 at ECF page 2.  In columns "H," "I," "J," and "K," plaintiff cites to a number of specific transactions in which Ironworks received tokens from a project, but did not send plaintiff his portion of the tokens.[9]  Boismenu Decl. ¶¶ 23-26; Dkt. 20-2 at ECF page 2.

---

[7] The USDT cryptocurrency, also known as "Tether," is a "stablecoin" designed to provide a stable price at all times.  *See* Compl. ¶¶ 66-67.

[8] The Court takes judicial notice of the historical value of the various cryptocurrencies at issue, as evidenced by plaintiff.  *See* Fed. R. Civ. P. 201(b); *Paypolitan OU v. Marchesoni*, No. 21-CV-5397, 2022 WL 17541091, at *2 n.3 (S.D.N.Y. Aug. 26, 2022), *report and recommendation adopted*, 2022 WL 17541749 (S.D.N.Y. Dec. 6, 2022).

[9] "[O]wnership of the [t]okens is tracked on a blockchain, a decentralized ledger that records each transaction. Just as banks settle and clear transactions moving between traditional currency accounts, blockchains track transactions in crypto-assets."  *Williams v. Binance*, 96 F.4th 129, 134

In addition, plaintiff supplemented his composite spreadsheet, at the Court's request, by providing an individual spreadsheet demonstrating the fees that were paid to Ironworks for each client project, including finder's fees, and those portions of the fees that are owed to plaintiff.  *See* Dkt. 27-2.[10]  The amounts detailed in the individual spreadsheets are consistent with the total amounts listed in the composite spreadsheet as the amount due for each project.  The Court has also verified that plaintiff's calculations appear correct.

Defendant has not opposed plaintiff's motion or otherwise presented any evidence disputing the damages sought by plaintiff.  The detailed accounting of the amounts owed to plaintiff, in light of defendant's failure to oppose the motion, provides a sufficient basis for the Court to determine damages.  *See Lagemann v. Spence*, No. 18-CV-12218, 2020 WL 5754800, at *13 (S.D.N.Y. May 18, 2020) ("Each Plaintiff's Declaration sets forth the amount of money Plaintiff invested with Spence, the dates Plaintiff did so, and the amount of Plaintiff's losses. . . .  These detailed accountings, in conjunction with Spence's refusal to oppose this motion, or answer questions at his deposition concerning damages, or otherwise answer the claims of this lawsuit, demonstrate that there is no genuine issue of material fact as to Plaintiffs' calculations."), *report and recommendation adopted*, 2020 WL 7384009 (S.D.N.Y. Dec. 16, 2020).

The Court further finds reasonable plaintiff's methodology of requesting the value of tokens as of the date of his termination, rather than the value of the tokens as of the date of judgment.  This approach "protects both Plaintiff[] and the defaulting Defendant against the 'highly volatile' fluctuating value of [cryptocurrency]."  *Jing*, 2022 WL 1505950, at *20-*21; *see Johnson v. Reece*, No. 22-CV-9601, 2024 WL 2304234, at *5 (S.D.N.Y. Apr. 10, 2024), *report and recommendation adopted*, 2024 WL 2305062 (S.D.N.Y. May 21, 2024); *Shi v. Le*, No. 21-CV-1361, 2022 WL

_____

(2d Cir. 2024).

[10] As discussed above, plaintiff also submitted an exemplar client advisory agreement, on which the fees detailed in the individual spreadsheets are based.  *See* Dkt. 27-1.

1085420, at *8-*9 (E.D.N.Y. Mar. 2, 2022), *report and recommendation adopted*, 2022 WL 896963 (E.D.N.Y. Mar. 28, 2022); *Lagemann*, 2020 WL 5754800, at *13; *see also Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) ("damages are calculated at the time of the breach").

Nevertheless, the Court recommends denying damages for two categories sought by plaintiff.  First, column "B" of his composite spreadsheet reflects "additional token amounts owed for two specific Projects, in accordance with a *prior agreement* made by Ferrum Network, that stipulates that [plaintiff] would receive additional compensation for extra work that [plaintiff] performed."  Boismenu Decl. ¶ 16 (emphasis added); Dkt. 20-2 at ECF page 2.  However, the only agreement referenced in the Complaint and submitted to the Court is the January 25, 2021 Senior Advisor Agreement.  *See* Dkt. 20-1.  Plaintiff cannot recover damages that are allegedly owed pursuant to the breach of an agreement that was not even mentioned in the Complaint, nor provided to the Court.  *See Spain v. Kinder Stuff 2010 LLC*, No. 14-CV-2058, 2015 WL 5772190, at *6 (E.D.N.Y. Sept. 29, 2015) (denying default judgment where plaintiff did not plead specified claim in the complaint); *cf.* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").  Thus, the Court recommends denying a damages award for 27,000 (12,000 + 15,000) tokens reflected in column "B" and deducting the requested damages amount by **$20,955** ((12,000 x $1.64000)[11] + (15,000 x $0.0850)[12]).  *See* Dkt. 20-2 at ECF page 2.

In addition, column "D" reflects tokens that plaintiff "invested through Ferrum Network, which it has yet to return to [plaintiff]."  Boismenu Decl. ¶ 18.  However, as discussed above, the Court recommends denying plaintiff's fraud claim, *see* § III(A)(3)(v), above, which includes his assertion that he was "induced . . . to invest personal funds in Ferrum Network," *id.* ¶ 192.

---

[11] 12,000 x $1.64000 = $19,680.
[12] 15,000 x $0.08500 = $1,275.

Accordingly, the Court recommends denying damages for the 762,198 tokens reflected in plaintiff's column "D" and deducting the requested damages amount by **$7,276.49** ((720,000 x $0.00700)[13] + (42,198 x $0.05300)[14]).

The Court finds that the amount requested is supported by plaintiff's submissions, with the exceptions discussed above. Accordingly, this Court finds that plaintiff is entitled to damages in the principal amount of **$1,030,852.95** ($1,059,084.44 - $28,231.49[15]).

### C.    Interest

Plaintiff seeks pre-judgment and post-judgment interest on the principal amount of damages. *See* Proposed J., Dkt. 17. In diversity cases, New York law governs the award of pre-judgment interest. *See Terwilliger*, 206 F.3d at 249. In New York, plaintiffs seeking monetary damages for breach of contract are entitled to pre-judgment interest as a matter of right. *See Matsumura v. Benihana Nat'l Corp.*, 465 F. App'x 23, 30 (2d Cir. 2012) (citing N.Y. C.P.L.R. § 5001(a)). The statutory rate for pre-judgment interest is 9 percent per annum calculated on a simple interest basis. N.Y. C.P.L.R. § 5004. Damages incurred when the cause of action accrued "shall be computed from the earliest ascertainable date the cause of action existed." *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) (quoting N.Y. C.P.L.R. 5001(b)). Here, plaintiffs seek pre-judgment interest from the date of his termination, April 8, 2022. The Court finds that date reasonable as the date of the breach of defendant's obligation to pay plaintiff the tokens owed. Thus, the Court recommends awarding pre-judgment interest on the principal amount of $1,030,852.95 at a rate of 9 percent per annum from April 8, 2022 or **$254.18** per day (($1,030,852.95 x .09) / 365), through the date of entry of judgment.

Plaintiff is also entitled to an award of post-judgment interest. As set forth in 28 U.S.C.

---

[13] 720,000 x $0.00700 = $5,040.

[14] 42,198 x $0.05300 = $2,236.49 (rounded).

[15] $20,955 + $7,276.49 = $28,231.49.

§ 1961, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961. "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." *Id.* The Second Circuit has held that an award of post-judgment interest is mandatory. *See Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008). Accordingly, the Court recommends awarding plaintiff post-judgment interest from the date judgment is entered until the date judgment is satisfied.

### D.    Costs

As a prevailing party, plaintiff is also entitled to recovery of costs approved by the Clerk of the Court. *See* Fed. R. Civ. P. 54(d)(1) ("Unless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party").

### Conclusion

For the foregoing reasons, the Court respectfully recommends granting plaintiff's motion for default judgment against defendant Ironworks BVI Ltd. and awarding plaintiff **$1,030,852.95** on his breach of contract claim. The Court further recommends awarding pre-judgment interest at the daily rate of **$254.18** from April 8, 2022 through the date of entry of judgment, and post-judgment interest at the statutory rate. The Court also recommends awarding plaintiff's recovery of costs. Finally, the Court recommends dismissing plaintiff's remaining claims.

A copy of this Report and Recommendation is being electronically served on counsel. Further, the Court directs plaintiff's counsel to serve a copy of this Report and Recommendation by overnight mail and first-class mail on defendant and to file proof of service on ECF by August 27, 2024.

Any objections to the recommendations made in this Report must be filed with the Honorable Orelia E. Merchant within 14 days after the filing of this Report and Recommendation and, in any event, on or before September 6, 2024. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*) (discussing waiver under the former ten-day limit).

**SO ORDERED**

Dated: Brooklyn, New York
        August 23, 2024

<u>s/ James R. Cho</u>
James R. Cho
United States Magistrate Judge